16-181-cr
United States v. Gomez

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2016
No. 16-181-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

BRAYAN GOMEZ,
*Defendant-Appellant*.

---

Appeal from the United States District Court
for the District of Connecticut.
No. 14-cr-63 — Janet C. Hall, *Chief Judge*.

---

ARGUED: MAY 16, 2017
DECIDED: DECEMBER 5, 2017

---

Before: PARKER, WESLEY, and DRONEY, *Circuit Judges*.

---

This appeal arises out of a traffic stop of Defendant-Appellant Brayan Gomez and his resulting judgment of conviction for heroin-trafficking in the United States District Court for the District of Connecticut (Hall, *C.J.*). During the five-minute traffic stop prompted by multiple traffic violations, the officers prolonged Gomez's seizure by asking him narcotics-related questions. Gomez then consented to the search of a bag in the car's trunk, which contained heroin. The district court denied Gomez's motion to suppress. We hold that the traffic stop violated the Fourth Amendment because the officers extended the stop for reasons unrelated to Gomez's traffic violations. Nevertheless, we conclude that the good-faith exception to the exclusionary rule applies because, at the time of the stop, the officers reasonably relied on our binding precedent, which we conclude is abrogated by *Rodriguez v. United States*, ––– U.S. –––, 135 S. Ct. 1609 (2015). Accordingly, we **AFFIRM** the judgment of the district court.

---

GEOFFREY M. STONE (Marc H. Silverman, *of counsel*), Assistant United States Attorneys, *for* Deirdre M. Daly, United States Attorney for the District of Connecticut, New Haven, CT, *for Appellee*.

MATTHEW W. BRISSENDEN, Garden City, NY, *for Defendant-Appellant*.

DRONEY, *Circuit Judge*:

This appeal arises out of a traffic stop of Defendant-Appellant Brayan Gomez. During surveillance in connection with a heroin-trafficking investigation in Hartford, Connecticut, officers observed Gomez commit several traffic violations and stopped his car. During the five-minute traffic stop, the officers prolonged the seizure by asking Gomez narcotics-related questions not pertinent to the traffic violations. After the questioning, Gomez consented to the search of a closed bag in the car's trunk, which contained nearly a half-kilogram of heroin and drug-packaging materials.

Gomez moved to suppress this evidence, arguing that, *inter alia*, his seizure violated the Fourth Amendment because the officers measurably extended the stop for investigatory reasons unrelated to the traffic violations. Applying this Court's holding in *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (per curiam)—that questioning unrelated to traffic violations during a five-to-six

3

minute stop did not violate the Fourth Amendment—the United States District Court for the District of Connecticut (Hall, *C.J.*) denied Gomez's suppression motion. Shortly before the district court's suppression ruling, however, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," indicating that the critical question is whether the unrelated investigation "prolongs—*i.e.*, adds time to— the stop." *Rodriguez v. United States*, —— U.S. ——, 135 S. Ct. 1609, 1612, 1616 (2015) (internal quotation marks omitted).

For the reasons that follow, we conclude that the Supreme Court's decision in *Rodriguez* abrogates our holding in *Harrison*.[1] We also conclude that Gomez's seizure, albeit only five minutes in length, contravenes *Rodriguez*'s holding and therefore violates the Fourth Amendment. Nevertheless, we conclude that the good-faith exception to the exclusionary rule applies because, at the time of the

---

[1] This opinion has been circulated to all the judges of the Court prior to filing.

4

stop, the officers reasonably relied on our precedent in *Harrison*. As to Gomez's other arguments, we conclude that the district court did not clearly err in concluding that (i) the initial stop was based on valid probable cause or reasonable suspicion to believe he committed a traffic violation, and (ii) he consented to the searches of the car, its trunk, and the closed bag in the trunk. Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

**I.    The Heroin-Trafficking Investigation**

In March 2014, Hartford police detective James Campbell and Drug Enforcement Administration ("DEA") special agent Michael Schatz—members of a DEA task force—were investigating a large-scale heroin-trafficking organization operating out of Hartford.[2]

---

[2] Unless otherwise noted, the following background is drawn from the testimony of Campbell and Schatz during the June 2015 suppression hearing, the second suppression hearing that was held due to the retirement of the district judge originally assigned to this case. In denying Gomez's motion to suppress, the district court credited their testimony as to the issues of (i) a traffic violation, (ii) Gomez's consent to the searches, (iii) the duration of the stop, and (iv) the nature of the questioning during the stop.

Based on information from a wiretap and cooperating sources, Campbell and Schatz suspected that the organization, led by Alex Ortiz-Gomez, was in the process of packaging several kilograms of heroin for street-level sale. In addition to this information, Campbell and Schatz knew that law enforcement officers in New Jersey stopped Ortiz-Gomez and his cousin, Defendant-Appellant Brayan Gomez, in a black Honda Accord the previous year, and during a search of the car the officers discovered nearly $80,000 in cash, which the DEA seized.[3]

On March 19, Campbell and Schatz began surveillance of two addresses associated with Alex Ortiz-Gomez—one in Hartford and another in East Hartford. The following morning, Campbell observed Brayan Gomez exit the Hartford address and drive away in a white Acura.[4] Schatz followed Gomez to the East Hartford

---

[3] Although Campbell initially believed that Brayan Gomez was Alex Ortiz-Gomez's brother, they are cousins.

[4] Campbell recognized Brayan Gomez at this time.

address, where Gomez briefly entered and exited the residence, switched cars, and again drove away. Gomez left the East Hartford address in a black Honda Accord—the same car involved in the $80,000 New Jersey cash seizure a year earlier.

With Campbell and Schatz (in separate vehicles) covertly following, Gomez drove to a nearby Ramada Inn hotel in East Hartford and parked the black Honda. Although Campbell and Schatz did not arrive in time to see Gomez enter the hotel, Campbell saw him exit the Ramada Inn a few minutes later carrying a "weighted" black duffel bag. After placing the bag in the Honda's trunk, Gomez drove away again, this time towards the highway; Campbell and Schatz continued to follow.

When Campbell saw Gomez place the duffel bag in the car's trunk and drive away, he notified Schatz and other nearby officers via radio transmissions that he planned to execute a pretextual stop of the Honda if Gomez committed a traffic violation. Gomez then

7

drove through a red light before entering the highway. After Gomez merged on to the highway, Campbell and Schatz observed him speeding and changing lanes without using a directional signal.

Gomez did not travel on the highway for long; he slowed to exit via an off-ramp in East Hartford, allowing Campbell and Schatz to catch up. According to Campbell, Gomez committed a third traffic violation at the end of the off-ramp by making a right turn at a red light without stopping.[5]

## II.     The Traffic Stop

Shortly after Gomez exited the highway, Campbell used his unmarked car's lights and siren to pull Gomez over. Schatz arrived at the scene shortly thereafter and parked his car in front of the black Honda, which was on the road's shoulder. While Schatz remained in his car, Campbell approached the Honda on the driver's side and

---

[5] As we discuss further in addressing the legality of the initial traffic stop, Campbell's testimony concerning this third purported violation may be inconsistent and perhaps contradicted by Schatz's testimony. *See infra* at 54–59.

8

noticed, through the open driver-side window, that Gomez "appeared to be nervous as far as what [is] typical in a normal traffic stop"—keeping his hands on the steering wheel, visibly shaking, and maintaining his gaze forward through the windshield. Campbell asked Gomez to turn off the car's engine. When Gomez, without complying, asked why he was stopped, Campbell again directed Gomez to turn off the engine for "safety purposes."

Shortly after Gomez turned off the engine, Campbell's questioning detoured from traffic violations to the subject of heroin:

> Question:    After [Gomez] shut the car off, what interaction did you have with him at [that] point?
>
> Campbell:  Once he complied and shut the vehicle off, he again asked me why he had been stopped. I told him that we were conducting an investigation into bad heroin as well as firearms within the city of Hartford. *Then* I also told him that, you know, I observed him travel[l]ing at a high rate of speed as well as travel[l]ing through the red lights.

App'x 248 (emphasis added).[6]

At Campbell's request, Gomez provided him with the car's registration, which listed Joan Sanchez as the owner. At that time, Campbell did not also ask for Gomez's license. Campbell then asked Gomez where he was coming from, and Gomez responded, untruthfully, that he had come from home. After Campbell inquired where he was travelling, Gomez replied that he was going to the home of his sister-in-law Joan Sanchez—the owner of the black Honda—but he did not know her exact address. Then, Campbell

---

[6] The precise order of Campbell's initial statements to Gomez is not entirely clear, as he testified during the November 2014 suppression hearing that he *first* notified the Gomez about his traffic violations and "[t]hen . . . told [Gomez] that [the officers] were doing an investigation involving heroin and firearms . . . ." App'x 47–48. Furthermore, on cross-examination during the suppression hearings, Campbell admitted that he "may" have initially told Gomez, untruthfully, that he was stopped because he fit the description of someone involved in a shooting. App'x 88–89. According to Campbell, this was a "technique" to "calm the person down or to not let them know that we [are] on to the fact of what they are doing initially." *See* App'x 88–89, 284–85; *see also* App'x 292.

asked for the name of Joan Sanchez's spouse; Gomez responded that she was married to Alex Ortiz-Gomez.[7]

After this initial questioning with Gomez in the driver's seat, Campbell asked him to exit the car and walk around to the passenger side.[8] At that point, Schatz exited his car and joined Gomez and Campbell in a grass area on the side of the road. While they stood in the grass, Campbell again told Gomez that they were investigating "bad heroin that had been laced with Fentanyl and firearms" in Hartford, and Gomez replied that he did not "know anything about that." App'x 250; *see also* App'x 48.

According to Campbell, he then asked whether Gomez "mind[ed]" if Campbell searched the car, and Gomez replied "no, you can go ahead . . . [t]here's nothing in there." App'x 250; *see also*

---

[7] At this point, there still appears to have been confusion over whether Gomez was the cousin or brother of Alex Ortiz-Gomez.

[8] According to Campbell, traffic from the nearby intersection was passing on the driver's side, and he therefore asked Gomez to exit the Honda for safety purposes.

App'x 50. While Schatz watched Gomez, Campbell conducted a search of the front passenger area and found a receipt from the Ramada Inn. The receipt, which displayed Gomez's name and home address,[9] indicated a stay from March 17 to March 19 (the day before the stop) that was paid for in cash.[10]

After Campbell found the receipt, he approached Gomez and asked "if he had anything on his person." App'x 253. Gomez replied that he did not. Campbell then conducted a pat-down and asked him to remove the items from his pockets. Gomez removed his wallet, which contained his license, and two Ramada Inn room keys from his pants pocket. With the receipt and room keys in hand, Campbell asked Gomez if he had stayed at the Ramada Inn. Gomez initially responded that he was not staying at the hotel, but that his

---

[9] The listed address was 82 Sisson Avenue in Hartford—the address where Gomez entered the white Acura earlier that morning.

[10] After the stop, Campbell obtained another receipt from the Ramada Inn's staff indicating that Gomez checked out of the Ramada Inn on March 20, the morning of the stop, and paid in cash.

friends were. When Campbell pressed Gomez as to why he had the keys if only his friends were staying there, Gomez admitted that he had been staying there as well.[11]

Campbell then asked Gomez whether he had anything in the car's trunk, and whether he "mind[ed]" if Campbell opened it. *See* App'x 256–58; *see also* App'x 58–59. According to both Campbell and Schatz, Gomez replied with words to the effect of "go ahead." App'x 257–58, 312; *see also* App'x 58–59, 176. When Campbell opened the trunk, he saw the black duffel bag that Gomez had carried out of the hotel earlier, a large cardboard box, and several smaller cardboard boxes stamped with the words "City Vibe."[12]

With the trunk open, Campbell asked whether Gomez "mind[ed]" if he opened the duffel bag. App'x 256–58; *see also*

---

[11] Campbell and Schatz testified that throughout their interaction with Gomez outside of the car, he appeared nervous—failing to make eye contact, swaying in place, and fidgeting.

[12] According to Campbell, Schatz was familiar with the "brand" of "City Vibe" heroin from executing controlled purchases through an informant. App'x 261–62; *see also* App'x 62.

13

App'x 62–63.  According to both Campbell and Schatz, Gomez said something along the lines of "no, but what are you looking for?" App'x 256, 258, 313; *see also* App'x 62–63, 177.  Campbell opened the bag to find more than 13,000 baggies of heroin packaged for sale, a larger bag containing raw heroin, and other items used in packaging narcotics; in total, the duffel bag contained 378.6 grams of heroin.  An East Hartford police officer who had arrived at the scene a few minutes earlier arrested Gomez.  Gomez never received a citation for the traffic violations that he committed before the stop.

Campbell and Schatz testified that the entire stop—from the moment Campbell pulled Gomez over to the moment he opened the duffel bag—lasted about five minutes.  App'x 271, 318.

**III.  District Court Proceedings**

In March 2014, a federal grand jury in the United States District Court for the District of Connecticut returned an indictment charging Gomez with one count of possession with intent to

distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

In June 2014, Gomez moved to suppress the heroin and drug-packaging materials, arguing that they were fruits of an unlawful search and seizure under the Fourth Amendment. Relying on his own two-page affidavit, Gomez claimed that he did not commit traffic violations and did not consent to the searches of the car, its trunk, or the closed duffel bag. Therefore, Gomez argued that (i) the traffic stop was not supported by probable cause or reasonable suspicion, and (ii) the warrantless searches were executed without his consent.[13]

In November 2014, the district court (Burns, *J.*) held a suppression hearing during which Campbell and Schatz testified; Gomez did not testify.[14] With the district court's permission, Gomez

---

[13] In his motion, Gomez did not argue that the traffic stop was unreasonably prolonged in violation of the Fourth Amendment.

[14] The East Hartford police officer who arrested Gomez after the searches also testified, essentially for the undisputed fact that Gomez did not receive a traffic citation.

supplemented his motion with a post-hearing brief in February 2015, arguing that Campbell's questions concerning the drug investigation were unrelated to the traffic violations and extended the traffic stop in violation of the Fourth Amendment. In March 2015, the presiding district judge retired without rendering a decision on Gomez's motion to suppress.

In June 2015, after the case was transferred to a different district judge (Hall, *C.J.*), the district court held a second suppression hearing. Two months before that resumed hearing, the Supreme Court decided *Rodriguez v. United States*, —— U.S. ——, 135 S. Ct. 1609 (2015), but neither Gomez nor the Government filed a supplemental brief concerning *Rodriguez* before or after the second hearing. During the second hearing, Campbell and Schatz testified again, and the court heard oral argument. The parties and the district court did not discuss *Rodriguez* during the hearing, but they did discuss this

16

Court's decision in *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010) (per curiam).

In late June 2015, the district court issued a ruling denying Gomez's motion to suppress. *See United States v. Gomez*, No. 14-cr-63, 2015 WL 3936397, at *1–3 (D. Conn. June 26, 2015). First, as to Gomez's argument that the initial stop was unlawful, the district court credited the testimony of Campbell and Schatz, concluding that there was probable cause or reasonable suspicion to believe that Gomez drove through a red light before entering the highway and was speeding on the highway.[15] *Id.* at *2. Second, the district court rejected Gomez's argument that he did not consent to the searches notwithstanding his affidavit, again finding the testimony of Campbell and Schatz credible and "largely consistent with each

---

[15] The district court did not base its decision on, or address, the disputed third traffic violation concerning the red light at the end of the exit ramp. *See id.* at *1–3.

17

other, as well as with their prior testimony in the [first suppression] hearing." *Id.*

Third, the district court concluded that Campbell did not unreasonably extend the traffic stop in violation of the Fourth Amendment, even though it acknowledged that he questioned Gomez about matters unrelated to the traffic violations. *See id.* at *2–3. The district court relied on this Court's holding in *Harrison*:

> The Second Circuit has previously found a stop of five to six minutes was not unlawfully prolonged, *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010), and other circuits have upheld longer intervals . . . .
>
> There is no evidence on the record to contradict testimony by Detective Campbell and Special Agent Schatz that the stop lasted five minutes at most until Gomez was arrested. Based on the record before it, the court finds that, while Gomez was questioned about matters unrelated to the traffic violation during this time period, such questioning did not unreasonably prolong the stop so as to render it unconstitutional.

*Id.* at *3. The district court did not address the Government's alternative argument that independent reasonable suspicion of a

drug offense justified extending the traffic stop for the narcotics questioning. *See id.* at *2–3.

After the district court denied his motion, in September 2015 Gomez conditionally pleaded guilty pursuant to a plea agreement that allowed him to appeal the district court's suppression ruling. In January 2016, the district court sentenced Gomez to sixty months' imprisonment, the statutory minimum under 21 U.S.C. § 841(b)(1)(B). After the district court entered judgment on January 8, 2016, Gomez timely appealed.

**DISCUSSION**

"On appeal from a denial of a suppression motion, we review a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo*." *United States v. Ulbricht*, 858 F.3d 71, 94–95 (2d Cir. 2017) (internal quotation marks omitted). In reviewing a district court's findings of fact for clear error, we also "pay special deference to the district

19

court's factual determinations going to witness credibility." *United States v. Jiau*, 734 F.3d 147, 151 (2d Cir. 2013).

Gomez raises three arguments on appeal. First, he contends that the officers unconstitutionally prolonged his traffic stop, a seizure under the Fourth Amendment. Second, Gomez argues that the district court clearly erred in finding that the initial stop was based on valid probable cause or reasonable suspicion to believe he committed a traffic violation. Third, he challenges the veracity of the officers' testimony and the district court's factual finding that he verbally consented to the searches of the car, its trunk, and the closed duffel bag in the trunk.

**I. Duration of the Traffic Stop**

    **A. Traffic Stops after *Rodriguez v. United States***

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.

20

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Therefore, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, which "requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) (alterations and emphasis omitted).

### 1. Pre-*Rodriguez* Supreme Court Decisions

A decade before *Rodriguez v. United States*, —— U.S. ——, 135 S. Ct. 1609 (2015), the Supreme Court explained in *Illinois v. Caballes* that even when a traffic stop is based on probable cause or reasonable suspicion at the outset, "[i]t is nevertheless clear that a

21

seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). More specifically, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

In *Caballes*, the Court considered a ten-minute traffic stop for speeding where one officer led a narcotics-detection dog around the driver's car while a second officer simultaneously "was in the process of writing a warning ticket." *Id.* at 406. The dog alerted to the presence of marijuana, and the driver was arrested and subsequently convicted of a state narcotics offense. *Id.* at 406–07. The Court affirmed the Illinois Supreme Court's "conclusion that the duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," and held that no

Fourth Amendment violation occurred. *See id.* at 408 (noting the state court had "carefully reviewed" the details of the officer's conversations with the driver and the radio transmissions "to determine whether he had improperly extended the duration of the stop to enable the dog sniff to occur").[16]

A few years later, in *Arizona v. Johnson*, the Court further considered "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). The Court explained in *Johnson* that a stop remains lawful so long as such inquiries do not "*measurably extend* the duration of the stop." *Id.* (emphasis added). In *Johnson*, during the time necessary for an officer to complete the processing of a traffic stop for a suspended vehicle registration, a different officer on the scene

---

[16] Accordingly, the Court proceeded to address a separate issue, holding that a dog sniff—an investigation unrelated to the underlying speeding violation—conducted while a driver is otherwise "lawfully seized for a traffic violation" "generally does not implicate legitimate privacy interests" and thus "does not rise to the level of a constitutionally cognizable infringement" of the Fourth Amendment. *Id.* at 409.

23

acquired reasonable suspicion that a passenger in the back seat was armed and dangerous. *Id.* at 328. The officer frisked the passenger and found an unlawful handgun. *Id.* The passenger moved to suppress the handgun in the resulting criminal prosecution, but the Supreme Court concluded that no Fourth Amendment violation occurred because, in part, the traffic stop was not "measurably extend[ed]." *Id.* at 333.

**2. Circuit Courts Applying *Johnson* and *Caballes***

After *Johnson* and *Caballes*, several of our sister circuits determined whether unrelated investigations during otherwise lawful traffic stops "measurably extend[ed]" such stops or prolonged them beyond the time "reasonably required" to issue a ticket. *See Johnson*, 555 U.S. at 333; *Caballes*, 543 U.S. at 407. Rather than adopt a *per se* rule that *any* extension of a traffic stop for an unrelated investigation is unlawful, several circuits assessed the

24

overall reasonableness of the stop's duration and the extension on a case-by-case basis.[17]

In particular, the Eighth Circuit developed a *de minimis* rule: a brief, minutes-long extension of a traffic stop to conduct an unrelated investigation, such as a dog sniff, is a *de minimis* intrusion on a driver's personal liberty that does not violate the Fourth Amendment. *See United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) (upholding four-minute delay as *de minimis* intrusion);

---

[17] *See, e.g.*, *United States v. McBride*, 635 F.3d 879, 883 (7th Cir. 2011) (noting that two-minute extension of traffic stop to ask unrelated questions would not "convert a lawful stop into an unlawful one" even if reasonable suspicion did not exist); *United States v. Turvin*, 517 F.3d 1097, 1101–04 (9th Cir. 2008) (explaining that "[w]e will not accept a bright-line rule that questions are unreasonable if the officer pauses in the ticket-writing process in order to ask them" and concluding that a fourteen-minute traffic stop—with a four-minute extension to investigate narcotics—was reasonable); *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007) (stating that unrelated questioning that does not "appreciably" extend the duration of a traffic stop is reasonable); *see also United States v. Bell*, 555 F.3d 535, 541–42 (6th Cir. 2009) (rejecting argument that independent "reasonable suspicion is required unless all of the [o]fficers' actions were focused precisely on the purpose of the stop with no deviation whatsoever"); *United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) ("Even *if* seventeen minutes is some minutes longer than the norm, we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself: *De minimis non curat lex*." (emphasis in original)).

*United States v. Martin*, 411 F.3d 998, 1000, 1002 (8th Cir. 2005) (upholding two-minute delay). The Fourth Circuit adopted a similar rule. *See United States v. Farrior*, 535 F.3d 210, 220 (4th Cir. 2008) (concluding that "any delay in conducting . . . drug-dog sniff amounted to a *de minimis* intrusion on [driver's] liberty interest" and was thus "not unreasonable as a violation of his Fourth Amendment rights").

In *United States v. Harrison*, we applied *Johnson* and *Caballes* in the context of a traffic stop (for a defective license plate light) that was extended by officer questioning; a search of the car revealed a gun and, ultimately, crack cocaine. *See United States v. Harrison*, 606 F.3d 42, 44–45 (2d Cir. 2010) (per curiam). After the officer recognized the driver from previous traffic stops that had uncovered narcotics, he inquired about the driver's travels that night, then separately questioned the passengers to "see if they would

26

corroborate" the driver's story, and then confronted the driver with the conflicting account of one of the passengers. *Id.* at 44.

Even though we acknowledged that the officer testified that he "had all of the information needed to issue the traffic ticket before he first approached" the car's passengers to ask questions unrelated to the defective light, we explained that the stop's extension was reasonable because "the time elapsed between the stop and the arrest was only five to six minutes, and the questions about the passengers' comings and goings were subsumed in that brief interval." *Id.* at 45. Furthermore, while we did not expressly adopt the *de minimis* rule, we cited decisions from other circuits for the proposition that "[l]onger intervals than five to six minutes have been deemed tolerable." *Id.* (collecting cases).[18] Accordingly, we held that the unrelated questioning during the five-to-six minute

---

[18] Indeed, we cited the Eleventh Circuit's decision in *Hernandez*, which doubted whether the Fourth Amendment "is concerned with such trifling amounts of time" as seventeen minutes. *See id.* (quoting *Hernandez*, 418 F.3d at 1212 n.7).

27

stop "did not prolong the stop so as to render it unconstitutional." *Id.*

### 3. *Rodriguez*

In *Rodriguez v. United States*, the Supreme Court rejected the Eighth Circuit's *de minimis* rule, holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, —— U.S. ——, 135 S. Ct. 1609, 1612 (2015). *Rodriguez* involved a seven or eight minute delay between the completion of a traffic stop, which had ended with a written warning, and a dog sniff that ultimately uncovered methamphetamine in the car. *See id.* at 1612–13.

Adopting findings made by a magistrate judge, the district court in *Rodriguez* found that the officer lacked independent reasonable suspicion of a drug offense to extend the detention once he issued the written warning, but it nevertheless denied the

defendant's motion to suppress, concluding that the seven-to-eight minute extension was "only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible." *Id.* at 1613–14. The Eighth Circuit affirmed, held that the delay was an acceptable *de minimis* intrusion, and did not review the district court's finding that the officer lacked independent reasonable suspicion to extend the seizure. *See id.* at 1614.

The Supreme Court vacated the Eighth Circuit's judgment, beginning by explaining that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (citation and internal quotation marks omitted). Acknowledging *Caballes* (dog sniff) and *Johnson* (questioning of a passenger by a different officer)—in which the Court "concluded that the Fourth Amendment tolerated certain unrelated investigations that *did not*

*lengthen* the roadside detention"—the Court reiterated that "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id.* (emphasis added) (alterations and internal quotation marks omitted). In other words, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

To be sure, the Court recognized that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Id.* at 1615. But "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Therefore, officers may conduct certain ordinary inquiries related to a traffic stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," without independent

30

reasonable suspicion of other crimes. *Id.* However, tasks not related to the traffic mission, such as dog sniffs or "[o]n-scene investigation into other crimes," are unlawful if they prolong the stop absent independent reasonable suspicion. *Id.* at 1616.

In so holding, the Court emphasized that the "critical question" is not whether the unrelated investigation "occurs before or after the officer issues a ticket," but whether conducting the unrelated investigation "prolongs—*i.e.*, adds time to—the stop." *Id.* (internal quotation marks omitted). Additionally, the Court specifically rejected the Government's contention that an officer may "incrementally" prolong a stop to conduct an unrelated investigation "so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.* (alteration omitted). The Court explained that an officer does not "earn bonus

time to pursue an unrelated criminal investigation" by "completing all traffic-related tasks expeditiously" because "[t]he reasonableness of a seizure . . . depends on what the police in fact do." *Id.*

The Court remanded to the Eighth Circuit, leaving open "[t]he question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation . . . ."[19] *Id.* at 1616–17.

On remand, the Eighth Circuit again affirmed, but it did not address reasonable suspicion of a drug offense. *See United States v. Rodriguez*, 799 F.3d 1222, 1223–24 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1514 (2016). Rather, it concluded that the good-faith exception to the exclusionary rule applied because officers conducted the extended traffic stop in objectively reasonable reliance on binding

_____

[19] The Court declined to affirm on the basis of the officer acquiring reasonable suspicion for the drugs. The district court concluded that the officer did not have reasonable suspicion to prolong the traffic stop once he issued the written warning. The Eighth Circuit did not address that issue. *Id.* at 1616–17; *see also id.* at 1615 (criticizing one dissent for making its "own finding of 'reasonable suspicion'").

circuit precedent at the time of the stop: the *de minimis* rule. *Id.* at 1224.

**B.     Analysis**

**1.     *Rodriguez* Abrogates *Harrison***

We begin by addressing Gomez's contention that the district court erred by applying *Harrison* rather than *Rodriguez*,[20] which the Supreme Court decided two months before the June 2015 suppression hearing.[21]

Although at least one district court in this Circuit has recognized *Rodriguez*'s abrogation of *Harrison*,[22] we have not yet had

---

[20] The district court cited *Rodriguez* but did not indicate that it affected *Harrison*. *See Gomez*, 2015 WL 3936397, at *2–3.

[21] A Supreme Court decision "construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." *United States v. Johnson*, 457 U.S. 537, 562 (1982).

[22] *See United States v. Gomez*, 199 F. Supp. 3d 728, 742–43 & n.11 (S.D.N.Y. 2016) (finding reasonable suspicion to extend the stop under the circumstances but noting that *Rodriguez* "rejected [*Harrison*'s] reasoning").

the opportunity to consider the issue. We conclude that *Harrison*'s holding does not survive *Rodriguez*.[23]

We held in *Harrison* that unrelated questioning "subsumed" in a five-to-six minute traffic stop does not measurably prolong a stop so as to render it unconstitutional. *See Harrison*, 606 F.3d at 45. We explained that the Constitution demands only that a seizure remain reasonable, and that the five-to-six minute seizure was "brief"— shorter than intervals that "have been deemed tolerable" in other circuits. *Id.*

In *Rodriguez*, however, the Court held that a police stop "exceeding the time needed to handle the matter for which the stop was made" violates the Fourth Amendment absent independent reasonable suspicion of another offense. *Rodriguez*, 135 S. Ct. at 1612. Moreover, the "reasonableness of a seizure . . . depends on

---

[23] Notably, the Government does not meaningfully contest that *Rodriguez* overrules *Harrison*. *See* Appellee's Br. 36 & n.7 (arguing that even if Gomez is correct, we "need not decide here whether *Rodriguez* abrogates *Harrison*").

what the police in fact do," rather than a comparison to the duration of a hypothetically expeditious seizure or the duration of a seizure in similar circumstances. *See id.* at 1616. Therefore, an officer may not obtain "bonus time to pursue an unrelated criminal investigation," and if such an investigation does in fact "prolong[]—*i.e.*, add[] time to—the stop," the seizure is unconstitutional absent reasonable suspicion of the other offense. *Id.* (internal quotation marks omitted). In *Harrison*, even though the officer testified that he "had all of the information needed to issue the traffic ticket" (the stop's mission), he added time to the seizure by "approach[ing] the [passengers] in the car to corroborate [the driver's] story"—an inquiry unrelated to the traffic violation. *Harrison*, 606 F.3d at 45. Based on the total length of the stop, we concluded that this extension was reasonable. *See id.* That conclusion, however, conflicts with, and thus must yield to, *Rodriguez*'s holding: unrelated inquiries that prolong or add time to a traffic stop violate the Fourth

Amendment absent reasonable suspicion of a separate crime.[24]  *See Rodriguez*, 135 S. Ct. at 1616.

Accordingly, we conclude that *Rodriguez* abrogates *Harrison*, and that the district court therefore erred by applying *Harrison* in denying Gomez's motion to suppress.  *See Gomez*, 2015 WL 3936397, at *3 (noting that this Court "found a stop of five to six minutes was not unlawfully prolonged" in *Harrison*, and that there was no evidence to contradict the testimony of Campbell and Schatz that the stop lasted "five minutes at most").

---

[24] We conclude that the other potential grounds for distinguishing *Harrison* from *Rodriguez* are unpersuasive.  First, although *Harrison* involved questioning while *Rodriguez* involved a dog sniff, the Court treated both as investigations unrelated to the traffic stop's mission.  *See Rodriguez*, 135 S. Ct. at 1614 (noting that *Johnson* (questioning) and *Caballes* (dog sniff) both involved unrelated investigations); *see also id.* at 1616 ("On-scene investigation into other crimes . . . detours from [a traffic stop's] mission.").  Second, the fact that the questioning in *Harrison* occurred before a ticket was issued (no ticket was ultimately issued, it seems) while the dog sniff in *Rodriguez* followed the issuance of a ticket is of no moment because in both situations, unrelated investigations extended the seizure.  As the Court explained in *Rodriguez*, "[t]he critical question . . . is not whether the [unrelated investigation] occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs—*i.e.*, adds time to—the stop."  *Id.* (citations and internal quotation marks omitted).

## 2. Gomez's Traffic Stop is Unconstitutional

We conclude that Gomez's traffic stop violates the Fourth Amendment because Campbell's investigative inquiries unrelated to the traffic violations "prolong[ed]—*i.e.*, add[ed] time to—the stop." *Rodriguez*, 135 S. Ct. at 1616 (internal quotation marks omitted). In applying *Rodriguez*, we look to what Campbell "in fact d[id]," not whether "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.*

Although both Campbell and Schatz testified that the stop lasted no longer than five minutes, the district court's factual findings confirm that "Gomez was questioned about matters *unrelated* to the traffic violation[s] during this time period." *Gomez*, 2015 WL 3936397, at *3 (emphasis added). The district court concluded, by applying *Harrison*, that these unrelated questions did not "unreasonably" prolong a concededly brief stop, but we have no

37

doubt that Campbell's inquiries did in fact add time to the stop in violation of *Rodriguez*.

From the moment that Campbell first approached the black Honda, his questioning "detour[ed] from th[e] mission" of the stop (Gomez's traffic violations) to the DEA's heroin-trafficking investigation. *See Rodriguez*, 135 S. Ct. at 1616. As Campbell stated on direct examination:

> Once [Gomez] complied and shut the vehicle off, he again asked me why he had been stopped. I told him that we were conducting an investigation into bad heroin as well as firearms within the city of Hartford. *Then* I also told him that, you know, I observed him travel[l]ing at a high rate of speed as well as travel[l]ing through the red lights.

App'x 248 (emphasis added). After Campbell asked for the car's registration (but notably not Gomez's license—necessary to write a ticket), he asked Gomez who Joan Sanchez— the car's owner—was married to, and Gomez responded that she was married to Alex Ortiz-Gomez (the suspected leader of the heroin-trafficking

38

organization).[25]  When Campbell asked Gomez to exit the car, his inquiries again turned to "bad heroin that had been laced with Fentanyl and firearms" in Hartford.  App'x 250.  Once Campbell searched the interior of the car and discovered the Ramada Inn receipt, he conducted a pat-down, which produced the hotel room keys.  With the receipt and room keys in hand, Campbell inquired whether Gomez was staying at the Ramada Inn, pressing him as to why he possessed the keys if only his friends were staying there.  Finally, Campbell searched the car's trunk and the contents of the trunk.

These undisputed facts demonstrate that Campbell spent much of the time of the stop, if not most of it, asking questions and executing searches related to the heroin investigation rather than conducting "ordinary inquiries incident to the traffic stop"—such as checking Gomez's license, determining whether there were

---

[25] This is an unusual question for a traffic stop that, under *Rodriguez*, must be focused on the traffic violations that justified the stop.

39

outstanding warrants for him, and inspecting the car's proof of insurance. *See Rodriguez*, 135 S. Ct. at 1615 (alteration omitted). Even assuming Gomez's detention lasted only five minutes, Campbell extended the seizure to ask questions pertinent to "an unrelated criminal investigation." *Id.* at 1616. Under *Rodriguez*, this violates the Fourth Amendment. *See id.* (explaining that reasonableness of stop depends on what officer in fact does rather than overall duration of stop in relation to other stops in similar circumstances). Just as an officer may not earn "bonus time" to conduct inquiries for an unrelated criminal investigation by efficiently processing the matters related to the traffic stop, *see id.*, an officer may not consume much of the time justified by the stop with inquiries about offenses unrelated to the reasons for the stop.

The Government does not appear to dispute this conclusion, arguing only in passing that Campbell and Schatz "simultaneously pursued the traffic violations and the heroin trafficking

40

investigation." Appellee's Br. 14. However, the record belies that argument. While Officer Campbell was initially questioning Gomez in the driver's seat of the black Honda, Agent Schatz had not even exited his car yet. And when Schatz did join them on the side of the road, he stood by and watched Gomez while Campbell questioned him and searched the car. This is not a situation where one officer expeditiously completed all traffic-related tasks while another officer questioned the driver or conducted a dog sniff without extending the stop. *See Caballes*, 543 U.S. at 406, 408 (declining to disturb state court's conclusion that stop was not improperly extended where second officer "immediately" responded to the scene of a stop and conducted dog sniff while first officer "was in the process of writing a warning ticket").

The Government's principal argument, however, is that the extended traffic stop is lawful under *Rodriguez* because the officers possessed independent reasonable suspicion that Gomez was

41

trafficking heroin. *See* Appellee's Br. 30–35; *see also Rodriguez*, 135 S. Ct. at 1615 (explaining that stop may not be prolonged to conduct unrelated investigation "absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). In so arguing, the Government contends that we should affirm on the basis of reasonable suspicion of a drug crime—an issue that was litigated below but the district court did not reach. *See Gomez*, 2015 WL 3936397, at *2–3.

"In general, 'a federal appellate court does not consider an issue not passed upon below.'" *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)); *accord Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004) ("In general, we refrain from analyzing issues not decided below . . . ."). This general rule, however, is a prudential one, and we therefore have "broad discretion" to consider issues that "were raised, briefed, and argued in the [d]istrict [c]ourt, but

42

that were not reached there." *Booking*, 254 F.3d at 418–19. We are "more likely to exercise our discretion (1) where consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000) (internal quotation marks omitted); *see also Hartford Courant*, 380 F.3d at 91 (noting that exercising discretion is appropriate where issue "is a matter of law suitable for determination by an appellate tribunal in the first instance"); *Booking*, 254 F.3d at 419 (deciding issue not reached below, in part, because it was "purely legal").

The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances. *United States v. Freeman*, 735 F.3d 92, 95–96 (2d Cir. 2013). Here, in its opinion and order, the district court made only four factual findings, which related exclusively to the traffic violations, Gomez's consent to the searches, the duration of

43

the stop, and the nature of the questioning during the stop.[26] *See Gomez*, 2015 WL 3936397, at *2–3. Accordingly, as to the factual portion of the reasonable suspicion issue, we are left with insufficient factual findings upon which to base a conclusion concerning reasonable suspicion. Moreover, the Government has not brought to our attention any "manifest injustice" that would result from not reaching the reasonable suspicion issue here. *See Baker*, 239 F.3d at 420. Therefore, under these circumstances, we decline to reach an issue not decided below. *Cf. Rodriguez*, 135 S. Ct. at 1615, 1616 (criticizing two dissents' willingness to "find[]" reasonable suspicion, an issue not decided by the Eighth Circuit).

---

[26] Specifically, the district court made the following findings: (i) "that [the officers] had probable cause or reasonable suspicion that Gomez had committed a traffic violation;" (ii) "that [Gomez] did consent to the search of his vehicle, including the trunk;" (iii) "that the process was reasonable in time, and that the officer's unrelated inquiries did not measurably extend the duration of the stop;" and (iv) "[that] Gomez was questioned about matters unrelated to the traffic violation during th[e] [stop]." App'x 339–40, 342 (internal quotation marks omitted).

Accordingly, Gomez's traffic stop violated the Fourth Amendment under *Rodriguez* because Campbell prolonged the traffic stop by asking unrelated investigatory questions and the district court made no finding that Campbell had independent reasonable suspicion of a different offense.[27]

### 3. The Good-Faith Exception Applies

Although we conclude that Gomez's traffic stop was unlawfully extended under *Rodriguez*, we nevertheless also conclude

---

[27] If it reached the issue, the district court could have—had it made more detailed findings of fact—found that there was reasonable suspicion to extend the stop. Setting aside what occurred during the traffic stop—which may have been unlawfully extended from its outset—the officers testified that *prior* to the stop they observed:  Gomez leave an address associated with Ortiz-Gomez (the suspected leader of a heroin-trafficking organization); drive to a second address associated with Ortiz-Gomez; quickly change cars; drive away in a car that had been previously stopped with Ortiz-Gomez and $80,000 in cash; drive to a hotel just miles away from the two addresses; exit the hotel minutes later carrying a weighted duffel bag that he was not carrying previously; and, before driving away, place the duffel bag in the car's trunk (rather than its passenger compartment). *See supra* at 5–8.  In other words, a pretextual stop and reasonable suspicion are not mutually exclusive; an officer may conduct a pretextual stop based on a traffic violation and then, in full compliance with *Rodriguez*, extend the stop if the officer develops reasonable suspicion based on the actions of a driver or passenger either (i) before the stop, or (ii) during traffic-related processing of the stop.  But again, an officer may not extend an otherwise lawful stop for non-traffic related purposes absent reasonable suspicion of another offense.

45

that suppression is not warranted because the good-faith exception to the exclusionary rule applies to the conduct of Campbell and Schatz.

"To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial.'" *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)). "The exclusionary rule's 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). Accordingly, the rule is intended to prevent "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. But "[s]uppression is 'our last resort, not our first

impulse.'" *Bershchansky*, 788 F.3d at 112 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The good-faith exception provides, among other things, that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule" because "suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety."[28] *Davis v. United States*, 564 U.S. 229, 232 (2011); *accord United States v. Aguiar*, 737 F.3d 251, 260 (2d Cir. 2013).

The Government argues, for the first time on appeal, that the good-faith exception applies because *Harrison*—which upheld a five-to-six minute traffic stop extended by unrelated questioning—was

---

[28] Gomez has not argued that this variation of the good-faith exception does not also apply to *seizures*, as opposed to searches, conducted in objectively reasonable reliance on binding appellate precedent. *See Davis*, 564 U.S. at 231–32 (noting that the Court created the exclusionary rule as a deterrent sanction to bar the introduction of evidence "obtained by way of *a Fourth Amendment violation*" (emphasis added)).

binding precedent in this Circuit at the time of Gomez's traffic stop, and the officers here conducted the five-minute stop in objectively reasonable reliance on *Harrison*.

It is notable that the Eighth Circuit applied the good-faith exception on remand after the Supreme Court rejected the *de minimis* rule in *Rodriguez*: "[u]nder *Davis* . . . the exclusionary rule does not apply because the circumstances of Rodriguez's seizure fell squarely within our case law and the search was conducted in objectively reasonable reliance" on the then-binding *de minimis* rule. *Rodriguez*, 799 F.3d at 1224, *cert. denied*, 136 S. Ct. 1514 (2016); *see also United States v. Ahumada*, 858 F.3d 1138, 1140 (8th Cir. 2017) (same). The Fourth Circuit also applied the good-faith exception in a similar situation after *Rodriguez*. *See United States v. Hill*, 849 F.3d 195, 200–01 (4th Cir. 2017) (applying good-faith exception to seizure conducted in reliance on Fourth Circuit's pre-*Rodriguez* rule).

48

In response, Gomez does not dispute that *Harrison* was binding precedent at the time of his March 2014 traffic stop—more than a year before the Supreme Court's decision in *Rodriguez*. Nor does he contend that the officers failed to conduct the seizure in objectively reasonable reliance on our precedent, or that the five-minute traffic stop here is distinguishable from the five-to-six minute traffic stop that we upheld in *Harrison*. Rather, with respect to the good-faith exception, he asserts forfeiture: the Government forfeited its good-faith argument, according to Gomez, by failing to raise it before the district court.[29] *See* Appellant's Reply Br. 1–3.

"It is well settled that arguments not presented to the district court are considered waived [or forfeited] and generally will not be considered for the first time on appeal." *Anderson Grp., LLC v. City of*

---

[29] Technically, Gomez asserts "waiver," but "[t]he terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Housing Servs. of Chi.*, No. 16-658, ⸺ S. Ct. ⸺, 2017 WL 5160782, at *3 n.1 (U.S. Nov. 8, 2017). "Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Id.* (alterations and internal quotation marks omitted).

49

*Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015). Nevertheless, we have "discretion to consider arguments waived [or forfeited] below because our waiver [and forfeiture] doctrine is entirely prudential." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (per curiam).

We generally exercise this discretion to consider an otherwise forfeited argument "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (alteration omitted). We will generally not, however, exercise our discretion where the forfeited argument was "available to the parties below and they proffer no reason for their failure to raise the arguments below." *Id.* (alterations and internal quotation marks omitted).[30]

---

[30] *See also In re Nortel*, 539 F.3d at 133 (declining to exercise discretion to consider forfeited argument where party "offered no reason for its failure to raise [forfeited] argument to the district court" and "refusal to address [forfeited] issue w[ould] not result in any injustice"); *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114

Under these circumstances, we will exercise our discretion to consider the Government's good-faith argument, which presents a question of law that requires no additional fact-finding. *See Rodriguez*, 799 F.3d at 1224 n.2 (Eighth Circuit rejecting Rodriguez's argument that Government forfeited good-faith argument by not raising it prior to remand).[31] The Government did not, in fact, raise the good-faith argument before the district court. But there is a reason why the Government did not invoke the good-faith exception: Gomez never argued that *Rodriguez* abrogated *Harrison*.

(2d Cir. 2005) (declining to exercise discretion to consider forfeited arguments that were "available to the defendants" and "[d]efendants proffer[ed] no reason for their failure to raise [them]").

[31] Our decision not to reach the Government's fact-dependent reasonable suspicion argument, which it raised before the district court, is not inconsistent with our decision to reach the Government's purely legal good-faith argument, which it raised for the first time on appeal. Although we have broad discretion to consider issues "raised . . . in the [d]istrict [c]ourt, but that were not reached there," *Booking*, 254 F.3d at 418–19, we are less inclined to do so where "there is [a] need for additional fact-finding," *Baker*, 239 F.3d at 420. Reasonable suspicion is a mixed question of law and fact, *Freeman*, 735 F.3d at 95–96, and here we are lacking the benefit of sufficient factual findings from the district court, *cf. Rodriguez*, 135 S. Ct. at 1615 (expressing disapproval of dissent making its "own finding of reasonable suspicion" (internal quotation marks omitted)); *id.* at 1616 (criticizing dissent for "resolving the [reasonable suspicion] issue, nevermind that the Court of Appeals left it unaddressed").

51

More specifically, Gomez first moved to suppress the evidence against him in June 2014, ten months before the Supreme Court decided *Rodriguez*. In his initial motion, Gomez did not even challenge the duration of the traffic stop generally, much less argue that *Harrison* no longer controlled. The district court held the first suppression hearing in November 2014—a month *after* the Supreme Court granted *certiorari* in *Rodriguez*. *See* 135 S. Ct. 43 (2014). Gomez did not file a supplemental brief concerning *Rodriguez* or even bring that case to the district court's attention during the first suppression hearing.

After the first hearing, Gomez filed a supplemental brief in February 2015 (a month *after* the Supreme Court heard oral argument in *Rodriguez*) contending, for the first time, that Campbell unreasonably prolonged the stop.[32] In his supplemental brief, however, Gomez once again did not mention *Rodriguez* or argue that

---

[32] It appears that the Government did not file a responsive supplemental brief.

*Harrison* was wrongly decided; rather, he argued that *Harrison* was factually distinguishable from the stop here.

After the case was transferred to a different district judge with Gomez's motion pending, the district court held a second suppression hearing in June 2015, two months after the Supreme Court decided *Rodriguez.* In advance of the hearing, Gomez did not file a supplemental brief, nor did he discuss the Supreme Court's decision during the hearing. When the district court twice questioned his counsel about *Harrison* during the hearing, his counsel did not raise *Rodriguez*.

Simply put, the first time Gomez argued that *Harrison* was no longer controlling precedent—or even cited *Rodriguez*—was in his opening brief on appeal. We therefore conclude that the Government's failure to raise the good-faith exception prior to its brief on appeal was understandable. *See In re Nortel*, 539 F.3d at 133

(declining to consider argument not previously raised where party offered "no reason" for failure to present argument earlier).

Accordingly, under these circumstances, we will exercise our discretion to consider the Government's good-faith argument, and we conclude that the exception applies because the officers conducted Gomez's five-minute traffic stop in objectively reasonable reliance on our then-binding precedent in *Harrison*. Therefore, although *Rodriguez* abrogates *Harrison,* and Gomez's traffic stop was unlawfully extended absent independent reasonable suspicion in violation of *Rodriguez*, the good-faith exception to the exclusionary rule applies.

**II.    Legality of the Initial Stop**

Gomez also contends that the traffic stop was unlawful at its inception because Campbell did not have valid probable cause or reasonable suspicion to believe he committed a traffic violation. *See Stewart*, 551 F.3d at 191. Although we "analyze *de novo* the ultimate

54

determination of such legal issues as probable cause," *United States v. Howard*, 489 F.3d 484, 490–91 (2d Cir. 2007), Gomez challenges the district court's factual finding (and corresponding credibility determination) that the stop was justified by at least one traffic violation. *See Gomez*, 2015 WL 3936397, at *2 ("The court finds that [the officers'] testimony was credible and supports a finding that they had probable cause or reasonable suspicion that Gomez had committed a traffic violation."). Accordingly, Gomez concedes that we review the district court's finding for clear error. Appellant's Br. 17, 24; *see Ulbricht*, 858 F.3d at 94–95.

Based on our review of the testimony during both suppression hearings and the contemporaneous radio communications, we conclude that the district court committed no error, clear or otherwise, in finding that Campbell had probable cause or reasonable suspicion to initiate the traffic stop. Campbell and Schatz testified consistently with each other across both hearings that

Gomez drove through a red light before entering the highway. Moreover, the radio communications corroborate their testimony. Additionally, they both testified repeatedly—again corroborated by the radio communications—that Gomez was speeding while on the highway.

Faced with this evidence, Gomez raises two arguments to challenge the district court's credibility determination. *See Jiau*, 734 F.3d at 151 (explaining that we "pay special deference" to a district court's factual determinations "going to witness credibility").

First, Gomez points to certain radio transmissions Campbell made (before Gomez even ran the red light entering the highway) indicating that the officers "definitely" needed to stop him. *See* App'x 202 at 13:39–14:46. Based on Campbell's statements, Gomez argues that the officers intended to stop him "*no matter what*—even if they had to manufacture a traffic violation in order to do so." Appellant's Br. 30. This argument is unpersuasive. As an initial

56

matter, it is well established that "an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998); *see Whren*, 517 U.S. at 813–14. Moreover, when confronted during the suppression hearing with these pre-violation statements, such as needing to "definitely . . . take a shot at [Gomez]," Campbell explained:

> Everybody was aware of the nature of our investigation. When we saw [Gomez] leave with a bag, I wanted everybody to be available if an opportunity to conduct a traffic stop or anything else presented itself. Meaning *if he conducts any violations* that we [a]re going to conduct a motor vehicle traffic stop for everybody to be aware.

App'x 236 (emphasis added). The district court, which listened to the radio communications, did not clearly err in crediting Campbell's explanation. *See United States v. Delva*, 858 F.3d 135, 160 (2d Cir. 2017) (noting that where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

57

Second, Gomez urges us to conclude that Campbell "offered false testimony" about Gomez's purported third traffic violation—turning right at a red light without stopping after exiting the highway—in order to cast doubt on Campbell's testimony as to the other two violations. Appellant's Br. 32. Although Campbell's testimony about the third violation may be inconsistent and contradicted by Schatz's account, Gomez's argument is insufficient to disturb the district court's finding for two reasons. First, we pay special deference to the district court's credibility determination, *see Jiau*, 734 F.3d at 151, and "a factfinder who determines that a witness has been . . . contradictory . . . in some respects may nevertheless find the witness entirely credible in the essentials of his testimony." *United States v. Delacruz*, 862 F.3d 163, 176 (2d Cir. 2017) (internal quotation marks omitted). Second, the district court expressly based its finding on only the first and second traffic violations—the red light before entering the highway and the speeding while on the

highway. *See Gomez*, 2015 WL 3936397, at \*2. Again, both officers testified consistently, corroborated by the radio communications, about those two violations. At the very least, the district court's conclusion is supported by a permissible view of the evidence and thus is not clearly erroneous. *See Delva*, 858 F.3d at 160.[33]

Accordingly, we cannot conclude that the district court erred in finding that Gomez's traffic stop was based on valid probable cause or reasonable suspicion of a traffic violation.

**III.    Consent to the Searches**

Finally, Gomez argues that the district court committed clear error in crediting the officers' testimony and finding that Gomez verbally consented to Campbell's searches of (i) the interior of the

---

[33] For the first time on appeal, Gomez suggests that Campbell, a Hartford police detective and cross-deputized DEA task force officer, had no authority to conduct a traffic stop in the neighboring jurisdiction of East Hartford. Although Gomez's counsel explored this issue on cross-examination during the first suppression hearing, he did not argue that the stop was invalid on this basis in his initial motion to suppress or his post-hearing supplemental brief, or during oral argument at the end of the second suppression hearing. We therefore consider this argument forfeited.

59

black Honda, (ii) its trunk, and (iii) the closed duffel bag in the trunk. His argument is unavailing.

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The existence and scope of a defendant's consent is a question of fact we review for clear error, and the "[G]overnment has the burden of proving, by a preponderance of the evidence, that the consent to search was voluntary." *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005); *see also United States v. Guerrero*, 813 F.3d 462, 467 (2d Cir. 2016) ("We do not reverse a finding of voluntary consent except for clear error." (internal quotation marks omitted)).

Here, based on the record of the suppression hearings and the district court's credibility findings, we encounter no such error. *See Gomez*, 2015 WL 3936397, at *2 ("The court finds [the officers']

testimony credible. Thus, notwithstanding Gomez's sworn statement to the contrary, the court finds that he did consent to the search of his vehicle, including the trunk . . . ." (footnote omitted)). Both Campbell and Schatz testified consistently during two hearings that Gomez verbally consented three separate times: first, to the search of the car's passenger area; second, to the search of the trunk; and third, to the search of the closed duffel bag in the trunk. We conclude that the district court committed no error in finding that Gomez consented to the three searches.[34]

## CONCLUSION

We conclude that the Supreme Court's decision in *Rodriguez* abrogates our holding in *Harrison*, and that the extension of Gomez's

---

[34] Gomez argues that even if he *did* verbally consent to the searches, Campbell's purportedly illegal pat-down prior to the trunk search tainted the voluntariness of Gomez's consent. The record is clear that Gomez waived this argument during the second suppression hearing, during which his counsel responded affirmatively when the court asked directly: "I think in one of your briefs earlier . . . you cite some cases that actually go to voluntariness of consent. I want to be clear my understanding is your client's position is that he gave no consent *so the voluntariness is not an issue*." App'x 327 (emphasis added).

61

traffic stop violated the Fourth Amendment. Nevertheless, the good-faith exception to the exclusionary rule applies because the officers reasonably relied on our then-binding precedent. As to Gomez's remaining arguments, the district court did not clearly err in concluding that the initial traffic stop was valid and that Gomez consented to the searches. We therefore **AFFIRM** the judgment of the district court.