**16-1112-cr**
*United States v. Santillan*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2017

ARGUED: OCTOBER 11, 2017
DECIDED: AUGUST 24, 2018

No. 16-1112-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

HECTOR SANTILLAN (AKA "BANE"),
*Defendant-Appellant,*

JUNIOR RIVERA-VASQUEZ,
*Defendant.* [*]

————

Appeal from the United States District Court
for the Southern District of New York.
No. 1:13-cr-138-1 – Robert W. Sweet, *District Judge*.

————

---

[*] The Clerk of Court is directed to amend the caption to conform to the above.

Before: WALKER, POOLER, *Circuit Judges,* and CRAWFORD, *District Judge.*[**]

———

Defendant-Appellant Hector Santillan appeals his conviction and sentence entered in the United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) following a jury trial. Santillan was convicted of participating in a conspiracy to distribute or possess with intent to distribute heroin, oxycodone, and cocaine, and distributing and possessing with intent to distribute 500 grams or more of cocaine. He was sentenced to 151 months' imprisonment.

Santillan's primary argument on appeal is that the district court erred in denying his pre-trial motion to suppress physical evidence recovered and statements made during a traffic stop and search. Specifically, Santillan argues that: (1) the traffic stop was unreasonably prolonged to the point that it became a *de facto* arrest for which probable cause was lacking; (2) there was no reasonable basis to frisk Santillan for weapons; (3) his statements were used against him in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and (4) police officers obtained consent to search a car in which he was a passenger through coercion. Santillan also argues that the government impermissibly vouched for its cooperating witness

[**] Judge Geoffrey W. Crawford, of the United States District Court for the District of Vermont, sitting by designation.

during trial, his trial counsel was ineffective, and the district court committed procedural errors when calculating his sentence.

In this opinion, we address Santillan's challenges to the stop and search. We conclude that the police officer conducting the traffic stop had reasonable suspicion to extend the stop when Santillan and the driver appeared nervous and were unable to provide information about where they were coming from. The stop did not ripen into a *de facto* arrest because the police officer used reasonable methods and intrusions to confirm or dispel his suspicions. Although certain evidence was improperly seized during a frisk, the physical evidence would have inevitably been discovered and thus suppression was not warranted. While accompanying statements should have been suppressed, the error was harmless. We find no merit in each of Santillan's other challenges to his sentence and conviction, which are resolved by a summary order issued simultaneously with this opinion. Accordingly, we AFFIRM Santillan's conviction and sentence.

Judge POOLER dissents in a separate opinion.

————

KRISTY J. GREENBERG, Assistant United States Attorney (Noah Solowiejczyk, Michael Ferrara, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

MICHELLE ANDERSON BARTH, Law Office of Michelle Anderson Barth, Burlington, VT, *for Defendant-Appellant.*

Hector Santillan, Ayer, MA, *pro se.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-Appellant Hector Santillan appeals his conviction and sentence entered in the United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) following a jury trial. Santillan was convicted of participating in a conspiracy to distribute or possess with intent to distribute heroin, oxycodone, and cocaine, and distributing and possessing with intent to distribute 500 grams or more of cocaine. He was sentenced to 151 months' imprisonment.

Santillan's primary argument on appeal is that the district court erred in denying his pre-trial motion to suppress physical evidence recovered and statements made during a traffic stop and search. Specifically, Santillan argues that: (1) the traffic stop was

unreasonably prolonged to the point that it became a *de facto* arrest for which probable cause was lacking; (2) there was no reasonable basis to frisk Santillan for weapons; (3) his statements were used against him in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and (4) police officers obtained consent to search a car in which he was a passenger through coercion. Santillan also argues that the government impermissibly vouched for its cooperating witness during trial, his trial counsel was ineffective, and the district court committed procedural errors when calculating his sentence.

In this opinion, we address Santillan's challenges to the stop and search. We conclude that the police officer conducting the traffic stop had reasonable suspicion to extend the stop when Santillan and the driver appeared nervous and were unable to provide information about where they were coming from. The stop did not ripen into a *de facto* arrest because the police officer used reasonable methods and intrusions to confirm or dispel his suspicions. Although certain evidence was improperly seized during a frisk, the physical evidence would have inevitably been discovered and thus suppression was not warranted. While accompanying statements should have been suppressed, the error was harmless. We find no merit in each of Santillan's other challenges to his sentence and conviction, which are resolved by a summary order issued simultaneously with this

opinion. Accordingly, we AFFIRM Santillan's conviction and sentence.

## BACKGROUND

On February 12, 2013, Santillan was a passenger in a car that Junior Rivera-Vasquez was driving from Manhattan to Massachusetts. Early in the afternoon, Westchester County Department of Public Safety Officer Isai Moreira, who was patrolling in a marked car on the Hutchinson River Parkway, observed Rivera-Vasquez commit five violations of New York's Vehicle and Traffic laws over a three-minute span: (1) tires touching the fog line; (2) speeding; (3) changing lanes without signaling; (4) a second incident of tires touching the fog line; and (5) following too closely. Officer Moreira signaled for Rivera-Vasquez to pull to the side of the highway. He testified at the suppression hearing that he planned for the vehicle stop to occur in a "safety zone," but the car pulled over approximately 50 feet ahead of that zone. Joint Appendix ("J.A.") 47. At that point, the shoulders of the heavily trafficked Hutchinson River Parkway were narrowed somewhat by snow that had accumulated as a result of a recent storm.

Officer Moreira approached the driver's side window and, after obtaining Rivera-Vasquez's license and registration, asked Rivera-Vasquez where the two men were going to and coming from. Officer Moreira testified at the suppression hearing that

Rivera-Vasquez told him they were going back to Massachusetts but was "unable to provide an answer [to where they were coming from]. He basically looked over to [Santillan] and said we're coming from his aunt's house," but "could not give me any location specifically." J.A. 49. Officer Moreira then asked Santillan for his identification, and Santillan provided a photocopy of a state license. Officer Moreira repeated his question about where the two men had come from. Santillan "was mentioning some type of city or town in—he eventually mentioned New Jersey." J.A. 50–51. Officer Moreira testified that he spoke to the men in a combination of English and Spanish, and that he is fluent in both languages. Officer Moreira testified that both men "appeared very nervous, were avoiding making eye contact," "their voice was kind of shaky and they were speaking in a low voice," and that Rivera-Vasquez's "hands were shaking as he [handed] over the documents." J.A. 50. Officer Moreira returned to his patrol car to conduct license checks. Rivera-Vasquez's license and registration were valid, and there were no outstanding warrants for either party. We note that the nervousness Officer Moreira witnessed occurred even though neither man had an outstanding warrant.

It is undisputed that at this point, approximately eight minutes after initially stopping the car, Officer Moreira had the information necessary to cite Rivera-Vasquez for the traffic violations he had

observed. However, Officer Moreira continued his investigation. At Officer Moreira's request, Rivera-Vasquez got out of the car and answered additional questions in Spanish regarding his relationship with Santillan, their trip to Santillan's aunt's house, and Santillan's aunt's name. Rivera-Vasquez did not know the name of Santillan's aunt or the location of her home, where, he said, he and Santillan had stayed overnight. He said he did not know Santillan well. Officer Moreira performed a pat-down of Rivera-Vasquez, removed his wallet and cell phone, then asked him to sit (uncuffed) in the back of the patrol car. He told Rivera-Vasquez that he was not in trouble.

Officer Moreira then asked Santillan a few questions in Spanish before asking him to get out of the car. Officer Moreira asked Santillan where he and Rivera-Vasquez were coming from and how well they knew each other. Santillan responded that he did not know Rivera-Vasquez well, that they had stayed for one or two nights at Santillan's aunt's house, and that his aunt lived somewhere in New Jersey, although "[h]e had difficulty pronouncing the name [of the location] and [Officer Moreira] had difficulty understanding [it]." J.A. 57. During this conversation, Officer Moreira saw that there were energy drinks and "multiple cell phones," which he later clarified to mean more than one cell phone, in the center console. J.A. 58, 191. At this point, Officer Moreira had already removed Rivera-Vasquez's cell phone from his pocket, and thus had reason to believe that the car

contained more cell phones than occupants. At some point, Officer Moreira noticed the passenger seat was higher than the driver's seat. J.A. 59, 177. Officer Moreira also "observed [Santillan] to be very hesitant in exiting" the car and "observed [Santillan] kind of look down in his general area as a quick look over before he exited." J.A. 58–59.

In response to further questions, Santillan indicated that he had no luggage, but had extra clothes in the car, and that he had $80 on him. Officer Moreira patted Santillan down and removed $1,000 from Santillan's back pants pocket. When Officer Moreira asked why he had "lied" about the amount of money he had on him, Santillan replied that he thought Officer Moreira was only asking about the money in his front pockets. J.A. 61. Officer Moreira asked Santillan to sit (uncuffed) in the back of a second patrol car which had arrived during the stop. As with Rivera-Vasquez, Officer Moreira informed Santillan that he was not in trouble or under arrest.

By this time, approximately 17 minutes had elapsed since Officer Moreira first initiated the traffic stop. Officer Moreira then asked for and received Rivera-Vasquez's verbal consent to search the car. Officer Moreira and another officer searched the car for approximately 20 minutes, during which time they noticed that the seat material covering the passenger seat appeared to be different than and newer than the material on the driver's seat. In addition, the

officers noticed that there was plastic wrapping in the space between the cushion and the backrest of the passenger seat. According to Officer Moreira's experience, which was based in part on Drug Enforcement Administration training, the plastic wrapping was consistent with wrapping used to transport narcotics. Officer Moreira then requested a narcotics dog.

At this point, approximately 37 minutes after the stop began, Officer Moreira wrote Rivera-Vasquez citations for three of the five violations of New York's Traffic and Vehicle laws. About 67 minutes after the stop began, the "narcotics canine" arrived on the scene and indicated that the front passenger seat of the car was positive for the presence of drugs. J.A. 75. Officer Moreira pulled back the seat and found two packages of material later determined to contain cocaine.

Approximately 80 minutes after the stop began, both Rivera-Vasquez and Santillan were arrested. At the police station, Rivera-Vasquez signed a written consent to search form, which Officer Moreira stated was to "reassure the consent that [he] had received on the scene." J.A. 82. Shortly thereafter, both Rivera-Vasquez and Santillan were arraigned on a complaint charging them with drug offenses.

Santillan, joined by co-defendant Rivera-Vasquez, moved to suppress all evidence found on his person and in the car, as well as his statements to Officer Moreira. He argued in relevant part that the

officers lacked probable cause or reasonable suspicion to detain him longer than eight minutes into the stop, the point at which Officer Moreira had the information needed to issue traffic citations. He also argued that the pat-down of his person was not supported by a reasonable suspicion to believe that he was armed, that his statements regarding the $1,000 should be suppressed because they were the fruit of illegally obtained evidence, and that his other pre-arrest statements should be suppressed because they were obtained through the coercive nature of a *de facto* arrest without *Miranda* warnings. The district court denied this motion and a motion to reconsider following *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), in which the Supreme Court addressed the unlawful prolongation of traffic stops.

After the suppression motion was denied, Rivera-Vasquez agreed to plead guilty and to become a cooperating witness against Santillan. Rivera-Vasquez testified at Santillan's trial regarding Santillan's role in distributing cocaine, heroin, oxycodone, and Percocet. He testified that he had delivered oxycodone to Santillan "several times" in packages of "between 1,500 and 2,000 pills." J.A. 517–18. Rivera-Vasquez also testified that Santillan had engaged in other criminal activity, including the possession of an assault rifle while trafficking in drugs and an attempted kidnapping of a person whom Santillan and others suspected of stealing narcotics and narcotics proceeds. According to Rivera-Vasquez's testimony,

Santillan and two other men asked the target of the attempted kidnapping to join them in a car. When the target opened the car door and saw Santillan holding an assault rifle, he fled. Rivera-Vasquez testified that he had seen Santillan with a specific assault rifle, and identified that assault rifle as the same one pictured in photographs recovered from Santillan's phone.

The jury convicted Santillan on both counts of conspiracy and possession of drugs with intent to distribute. The district court sentenced Santillan principally to 151 months' imprisonment, at the bottom of his sentencing guidelines range of 151 to 188 months. Santillan timely appealed.

## DISCUSSION

Santillan argues that we should vacate his conviction and sentence because the district court erred by denying his motion to suppress evidence seized from the vehicle and from his person and statements he made during the course of the stop. His principal contention is that the stop was unreasonably prolonged in violation of the Fourth Amendment.[1] *See Rodriguez*, 135 S. Ct. at 1612, 1616. Under *Rodriguez*, authority for a traffic-stop seizure ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed, unless the officer develops reasonable suspicion of

---

[1] On appeal, Santillan does not challenge the basis of the traffic stop.

criminal activity sufficient to extend the stop. *Id.* at 1614–15. We disagree with Santillan.

First, we conclude that Officer Moreira had reasonable suspicion to extend the traffic stop. Second, we determine that Officer Moreira had reasonable suspicion to believe that Santillan was armed, and therefore had sufficient justification to frisk him. Although the $1,000 recovered during the frisk should not have been removed from Santillan's pockets, it would have inevitably been discovered and admitting Santillan's statements about it was harmless error. Third, Santillan was never subject to custodial arrest and *Miranda* warnings were not required. Fourth, Santillan's detention never ripened into a *de facto* arrest, either due to the stop's duration or to the fact that Santillan was placed in a police car, because Officer Moreira took reasonable steps under the circumstances, and therefore probable cause for Santillan's detention was not required. Finally, Santillan cannot challenge the search of the car because he had no reasonable expectation of privacy in it.

**I.     Officer Moreira had Reasonable Suspicion to Prolong the Stop of Santillan and his Investigatory Tactics Were Reasonable**

On review of a challenged suppression order, we examine the district court's findings of fact for clear error, reviewing *de novo* questions of law and mixed questions of law and fact, including the

existence of reasonable suspicion to stop or extend a stop. *See United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015). We view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training. *Id.* at 60–62. *See also United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (noting that we ask "if the conduct would appear suspect to one familiar with the practices of narcotics couriers," even if it would appear innocuous to an untrained observer) (internal quotation marks omitted).

"Reasonable suspicion requires more than an inarticulate hunch." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (internal quotation marks and alteration omitted). "The suspicion must derive from specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Id.* (internal quotation marks omitted). The reasonable suspicion standard is "not high" and is "less demanding than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot." *Singletary*, 798 F.3d at 60 (internal quotation marks and citation omitted). Conduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion where there is some indication of possible illicit activity. *See United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008). "[N]ervous,

evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

In determining whether a traffic stop has reasonably been extended into an investigatory seizure, we consider whether: (1) the officer's action was justified at its inception; and (2) the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly, during which time it was necessary to detain the defendant. *United States v. Foreste*, 780 F.3d 518, 526 (2d Cir. 2015).

Here, Santillan does not dispute that the traffic stop, based upon driving infractions, was valid at its inception. Santillan argues, rather, that Officer Moreira lacked reasonable suspicion to prolong the stop past the eight-minute mark, when the tasks needed to issue the traffic citations were complete. We disagree. Officer Moreira had reasonable suspicion to prolong the stop taking into account the circumstances as a whole, including Santillan and Rivera-Vasquez's nervous behavior, illustrated by their avoidance of eye contact with Officer Moreira and visibly shaking hands, coupled with their inability to provide a clear answer as to where they had come from— a fact that cannot be explained as the result of a language barrier because Officer Moreira is fluent in Spanish and spoke to the men in both English and Spanish.

We recognize that this is a close case, and that the factors establishing reasonable suspicion are not overwhelming. We conclude, however, that they were sufficient here to provide Officer Moreira, an experienced police officer trained in narcotics trafficking interdiction, with articulable and specific facts leading him to believe that the two men may have been involved in some type of criminal activity and that Officer Moreira had the authority to investigate further.

Officer Moreira testified that Rivera-Vasquez and Santillan were "very nervous" despite having no outstanding warrants that could have explained their nervousness. J.A. 50.[2] Nervousness, particularly extreme nervousness, is a factor supporting reasonable

---

[2] Although Judge Pooler professes shock that we would permit a negative inference based upon Rivera-Vasquez and Santillan being "very nervous" despite there being no open warrants against them, this is but one reasonable inference that an experienced officer could draw from the circumstances, as Officer Moreira did at trial. *See* J.A. 446. Judge Pooler devotes considerable attention to the factor of nervousness in her dissent, and we agree that there may be innocent explanations for showing some degree of nervousness in the presence of law enforcement officers. We disagree, however, that such possible innocent explanations negate reasonable suspicion here, where nervousness is just part of the totality of circumstances that Officer Moreira was permitted to consider. We assess reasonable suspicion from the perspective of a trained law enforcement officer on the scene, not from the perspective of an appellate judge. Thus, rather than spinning out innocent explanations for each factor piece by piece or substituting our view, in hindsight, for that of an experienced officer, our task is to consider the entire picture—as understood by the officer—to determine whether his suspicion had a reasonable basis.

suspicion. *See United States v. Bailey*, 743 F.3d 322, 334 (2d Cir. 2014); *id.* at 350 (Pooler, J., concurring in part and dissenting in part) ("Understandably, nervousness, odd, or furtive behavior have all been identified by the Supreme Court as . . . important factor[s] in the reasonable suspicion analysis, because such behavior in the presence of law enforcement is reasonably linked to criminal activity.").

In addition, Santillan and Rivera-Vasquez's joint inability to readily explain where they had just come from—even though Rivera-Vasquez was driving and Santillan was purportedly related to the woman from whose house they had allegedly come—provided further basis for Officer Moreira to continue the investigation. We have long recognized that reasonable suspicion may be based, at least in part, on an implausible story, an implausible explanation of the purpose of a trip, or a story that simply does not ring true. *See United States v. Reyes*, 821 F.2d 168, 169–70 (2d Cir. 1987) (collecting cases). Our sister circuits are in accord. *See United States v. Green*, 897 F.3d 173, 185–86 (3d Cir. 2018); *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016); *United States v. Collazo*, 818 F.3d 247, 258, 260 (6th Cir. 2016); *United States v. Sanford*, 806 F.3d 954, 956–57 (7th Cir. 2015); *United States v. Simpson*, 609 F.3d 1140, 1148–51 (10th Cir. 2010); *United States v. Foreman*, 369 F.3d 776, 784–85 (4th Cir. 2004). Further, Officer Moreira noted at the trial that the stop occurred on the Hutchinson River Parkway, a location that Officer Moreira knew to be a corridor

for drug trafficking.[3] *See Wardlow*, 528 U.S. at 124; *see also Padilla*, 548 F.3d at 188.

Although any one of these factors, standing alone, might not support reasonable suspicion, we do not subject factors pertaining to an officer's reasonable suspicion to such a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Rather, we view each factor as part of "the whole picture" from which an officer draws "certain common sense conclusions about human behavior," *United States v. Cortez*, 449 U.S. 411, 418 (1981), even if those conclusions "might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). We consider and weigh these factors "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418. Under this approach, we conclude that these factors, taken together, provided Officer Moreira with reasonable suspicion. The men's nervousness and inability to specify where they had come from would have suggested to a reasonable officer with Officer Moreira's experience that the men were struggling to fabricate a cover

---

[3] While "[i]t is settled law that the validity of an arrest or search can be supported by evidence which was adduced at trial even though [it] was not presented at the pretrial suppression hearing," *United States v. Caniesco*, 470 F.2d 1224, 1226 (2d Cir. 1972), we need not rely on Officer Moreira's trial testimony here. The other factors supporting reasonable suspicion were sufficient.

story. We therefore hold that Officer Moreira had reasonable suspicion to prolong the traffic stop.[4]

We next examine whether Officer Moreira diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly. *Foreste*, 780 F.3d at 526. *See also United States v. Sharpe*, 470 U.S. 675, 685 (1985). For the reasons that follow, we hold that Officer Moreira diligently pursued reasonable means of investigation and that Santillan was never subject to custodial interrogation or a *de facto* arrest.

**A. Officer Moreira had reasonable suspicion that Santillan was armed, the $1,000 recovered during the frisk would have inevitably been discovered, and admitting Santillan's statements about it was harmless error**

Santillan argues that the $1,000 seized from his pocket should have been suppressed because Officer Moreira lacked reasonable suspicion to subject him to a pat-down or frisk. He reasons that if

---

[4] In response to our decision in *United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017), the government suggested, for the first time in a letter submitted via Fed. R. App. P. 28(j), that the good-faith exception provides a further basis to affirm because the Supreme Court had not decided *Rodriguez* when Officer Moreira stopped Santillan. *See United States v. Santillan*, No. 16-1112-cr, Dkt. No. 93 (2d Cir. Dec. 11, 2017). We decline to consider this argument because the government forfeited it and proffered no reason for doing so, particularly after Santillan filed a reconsideration motion predicated on *Rodriguez. See* No. 16-1112-cr, Dkt. No. 95 (2d Cir. Dec. 14, 2017); J.A. 357–67; *cf. Gomez*, 877 F.3d at 94–95.

Officer Moreira had truly been concerned for his safety, he would have frisked both Rivera-Vasquez and Santillan immediately upon asking them to get out of the car, or he would not have turned his back on Santillan as Santillan got out. We are not persuaded.

For the frisk to have been lawful, Officer Moreira must have had reasonable suspicion that Santillan was armed and dangerous. *See Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). Officer Moreira had reasonable suspicion to believe that Santillan was armed and dangerous based on the totality of the circumstances. We have already concluded that Officer Moreira had reasonable suspicion to believe that Santillan was involved in some type of criminal activity. Further questioning heightened rather than dispelled those suspicions. In addition, Officer Moreira testified that he had observed several indicators of possible narcotics activity, specifically the differences between the seat heights and the presence of multiple cell phones.

Narcotics activity and weapons often go hand in hand, *see United States v. Oates*, 560 F.2d 45, 62–63 (2d Cir. 1977), and the type of investigative detention at issue here is fraught with danger for the officer. *See Johnson*, 555 U.S. at 330–31; *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *see also Oates*, 560 F.2d at 63. Officer Moreira had a sufficient basis to suspect that Santillan may have been armed and dangerous to conduct a frisk in order to ensure his own safety and the

safety of other officers as the investigation continued. *See United States v. McCargo*, 464 F.3d 192, 200 (2d Cir. 2006).

Santillan suggests that Officer Moreira's decision to question Santillan before frisking him casts doubt on whether Officer Moreira had sufficient reason to conduct the frisk. We disagree. Officer Moreira questioned Santillan in order to confirm or dispel his suspicions. Only then did he subject Santillan to a more-intrusive frisk. This course of action was *less* intrusive, and *more* in line with the protection of constitutional rights, than requiring Officer Moreira to have frisked Santillan as soon as he left the car or not at all. Neither common sense nor our own precedent demand such a choice. *See United States v. Diaz*, 854 F.3d 197, 207 (2d Cir. 2017).

Santillan next argues that Officer Moreira unlawfully seized $1,000 from his pants pocket and neither the money nor Santillan's statements about it should have been admitted. We agree with the district court that Officer Moreira's frisk exceeded Fourth Amendment limitations. During a pat-down or frisk for weapons and contraband, officers are only permitted to remove for further inspection objects that are immediately apparent as such. *See, e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993). The $1,000 in cash Santillan had on his person was neither weapons nor contraband, and Officer Moreira should not have removed it from Santillan's pockets during the frisk. Nevertheless, we conclude, as did the district court,

that the $1,000 was admissible because it would have been inevitably discovered during a search incident to arrest after the officers discovered cocaine in the car. *See, e.g., Nix v. Williams*, 467 U.S. 431, 443–44 (1984); *United States v. Eng*, 971 F.2d 854, 861–62 (2d Cir. 1992).

While the $1,000 was admissible, it still was improperly taken and thus Santillan's statements about it were not admissible. They were the fruit of the poisonous tree and should have been suppressed. *See Bailey*, 743 F.3d at 341.

Nevertheless, where evidence obtained in violation of constitutional rights is wrongfully admitted at trial, the error can be deemed harmless where it appears "beyond a reasonable doubt" that it "did not contribute to the verdict obtained." *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *United States v. Dhinsa*, 243 F.3d 635, 658–64 (2d Cir. 2001). In order to assess harmlessness, we must "consider the importance of the erroneously admitted statements to the government's proof of guilt." *Bailey*, 743 F.3d at 342. A number of factors inform this analysis, chief among them the strength of the prosecution's case absent the erroneously admitted statements. *See United States v. Okatan*, 728 F.3d 111, 120 (2d Cir. 2013). We also consider the materiality of the improperly admitted evidence to critical facts in the case, whether the evidence was cumulative, and the prosecutor's conduct regarding the evidence. *Id.*

Although Santillan notes that the government relied on Santillan's statements throughout his trial, we easily conclude that the statements were cumulative because of the overwhelming evidence of Santillan's guilt and the relative insignificance of the statements pertaining to the $1,000. The government presented a strong case, consisting of the narcotics uncovered in the car, pictures from Santillan's cellphone, the $1,000 in cash from Santillan's person, and the corroborated testimony of Rivera-Vasquez. Santillan's statements about the $1,000 and the prosecutor's argument that his initial dishonesty tended to prove that he knew about the narcotics hidden in the car were not of major import in light of the totality of the evidence against Santillan. *See Bailey*, 743 F.3d at 344–45 (noting that where the government first has to prove exculpatory disclaimers were false, in order to urge the jury to infer consciousness of guilt, those statements cannot be deemed particularly important to the prosecution's case); *United States v. Treacy*, 639 F.3d 32, 45–46 (2d Cir. 2011). Thus any error in admitting the statements was harmless.

**B. There was no custodial interrogation or *de facto* arrest and *Miranda* warnings were not required**

Santillan argues that all of his statements should have been suppressed because he was subjected to a *de facto* arrest but was not given *Miranda* warnings. Thus, any evidence recovered from the car should have been suppressed as the fruit of an unlawful *de facto* arrest.

We agree with the district court that Santillan was never subject to custodial interrogation or a *de facto* arrest and thus these arguments are without merit.

We review *de novo* a district court's determination as to whether a suspect was in custody for the purposes of *Miranda. See United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004). We use a two-step, objective test, that asks whether: (1) a reasonable person in the defendant's position would have understood that he or she was free to leave; and (2) there was a restraint of freedom of movement akin to that associated with a formal arrest. *See United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). For the second step, relevant factors are whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation. *Tankleff v. Senkowski*, 135 F.3d 235, 243–44 (2d Cir. 1998); *see also Newton*, 369 F.3d at 672 (explaining that the *Tankleff* factors are relevant to the second part of the *Miranda* custody inquiry, and clarifying the order in which the questions are asked).

In considering whether Santillan would reasonably have considered himself free to leave, we note both the similarities and dissimilarities as between this stop and a typical traffic stop. Although we have already concluded that this traffic stop was

prolonged into an investigatory stop, the location and atmosphere of the questioning resembled a traffic stop in those respects that bear on the question of whether Santillan would have been any less free to leave than he would have been during a typical traffic stop. First, Santillan was questioned in public view on the side of the road about his relationship to the driver and details about their travels. Second, Officer Moreira never handcuffed Santillan or displayed a weapon. Although Santillan was frisked and directed to wait in the police car while Officer Moreira and two more officers who arrived later continued their investigation, he was told that he was not under arrest. On the balance, this stop bore a much greater similarity to a traffic stop or *Terry* stop than to the type of custodial interaction that would trigger the requirement of *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 437–39 (1984).

As for the "ultimate inquiry" of whether there was a restraint of freedom of movement akin to that associated with a formal arrest, *Newton*, 369 F.3d at 670, we consider whether a reasonable person in Santillan's position would have understood that his detention was not likely to be "temporary and brief" and whether a person stopped under the circumstances at issue would feel that he was "completely at the mercy of the police." *Id.* at 675 (quoting *Berkemer*, 468 U.S. at 437–38). *See also Howes v. Fields*, 565 U.S. 499, 509 (2012). In *Newton*, we addressed the distinctions between a Fourth Amendment and a

*Miranda* analysis, 369 F.3d at 669–72, concluding that *Miranda*'s concern is not with the reasonableness of an officer's actions but with "the facts known to the seized suspect and whether a reasonable person would have understood that his situation was comparable to a formal arrest." *Id.* at 675. Here, Santillan was questioned, frisked, and asked to sit in the back of a police car, but he was not handcuffed and was told that he was not under arrest. He could observe two police officers attempting to deal with the difficulties of interviewing two people on a snow-covered shoulder of a heavily trafficked highway following a legitimate traffic stop and could reasonably appreciate that his placement in a patrol car was for safety reasons. Under these circumstances, we conclude that a reasonable person would not have felt that he was subject to a formal arrest, and therefore that *Miranda* warnings were not required.

Our analysis of whether a *de facto* arrest occurred, however, shifts from Santillan's perspective of the seizure to Officer Moreira's. Specifically, we ask whether Officer Moreira's actions were reasonable under the circumstances. *See id.* at 673–74. To determine whether a stop is so intrusive that it becomes a *de facto* arrest, we look to: the amount of force used by police, the need for such force, and the extent to which the suspect's freedom of movement was restrained. *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004). In particular, we consider the number of officers involved, whether the

target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether handcuffs were used. *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993).

Santillan's arguments that the stop became a *de facto* arrest focus on two aspects: (1) he was placed in the back of a police car; and (2) the duration of the stop was too lengthy to be considered an investigatory stop. We disagree. The stop was not extended unreasonably and did not employ tactics more invasive than necessary under the circumstances, which included the dangers and difficulty of questioning two suspects separately on a highway shoulder narrowed by snow. *See Florida v. Royer*, 460 U.S. 491, 504 (1983); *Mimms*, 434 U.S. at 111. At all times, Officer Moreira and the two officers eventually assisting him were engaged in steps to dispel or confirm their reasonable suspicions. *See United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995). Although those steps prolonged the stop, they did not do so unreasonably. *See Bailey*, 743 F.3d at 336.

Officer Moreira's decision to place Santillan in the back of a police car did not transform the stop into an arrest because the decision was a reasonable response to legitimate safety concerns. *See Vargas*, 369 F.3d at 102. Because we conclude that Officer Moreira's actions were at all times reasonable steps to confirm or dispel his suspicions and were appropriate responses to the hazardous

conditions presented, we have no reason to explore whether the plastic wrapping discovered in the seat cushions, together with the other evidence, would have provided sufficient probable cause to arrest Santillan earlier in the stop.

**C. Santillan cannot challenge the search of the car because he had no reasonable expectation of privacy in it and the district court did not clearly err in holding that Rivera-Vasquez consented to the search**

Finally, Santillan argues that the evidence from Rivera-Vasquez's car should be suppressed because Rivera-Vasquez's consent to search was tainted by an unreasonably prolonged and intrusive stop and was therefore not voluntarily given. Although Santillan has standing to challenge the prolongation of the traffic stop, *see Brendlin v. California*, 551 U.S. 249, 251 (2007), he lacked standing to challenge the search of the car because he had no reasonable expectation of privacy in a car being driven by and registered under the name of a man he claimed not to know very well. *See Rakas v. Illinois*, 439 U.S. 128, 142–43, 148 (1978).

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *Id.* at 133. "Accordingly, a defendant's Fourth Amendment rights are violated 'only when the challenged conduct invade[s] *his* legitimate expectation of privacy rather than that of a third party.'" *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002)

(quoting *United States v. Payner*, 447 U.S. 727, 731 (1980)). A "defendant seeking suppression of evidence found without a search warrant must show that he had a reasonable expectation of privacy in the place or object searched." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017). One need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects, so long as he has the right to exclude others from dealing with the property. *Perea*, 986 F.2d at 639–40.

Santillan had no reasonable expectation of privacy in Rivera-Vasquez's car because he had no right to exclude others from it and he assumed the risk that its owner would grant consent for the search. *See United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988). *See also United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981). Because Santillan did not have an objectively reasonable expectation of privacy in the area under or behind the passenger seat, he has no standing to challenge whether Rivera-Vasquez's consent to search was voluntary. We note, however, that the district court found that it was, and we would not disturb such a finding absent a showing of clear error, which Santillan fails to make here. *See United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988).

\*       \*       \*

We have considered each of Santillan's challenges to the stop, frisk, and search and find them unavailing. We therefore affirm the

district court's denial of Santillan's motions to suppress evidence from the car and from his person. While the district court erred in admitting statements regarding the $1,000, the error was harmless.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's denial of Santillan's motion to suppress evidence recovered from the vehicle search and search of his person and the statements he made over the course of the stop. For the reasons stated in this opinion and in the summary order issued simultaneously with this opinion that addresses Santillan's remaining arguments, we AFFIRM the judgment of the district court in all respects.

POOLER, *Circuit Judge*:

I respectfully dissent. I would hold that the officers lacked reasonable suspicion to prolong the stop beyond the time needed to issue the traffic citation, in violation of the Fourth Amendment and *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and reverse the judgment of the district court.

This case is a clear example of officers acting on a "mere hunch," without reasonable suspicion. *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016). The indefinite, nondescript nature of the officers' suspicions is apparent from Officer Moreira's testimony, which is replete with passages like, "I felt that his behavior was suspicious. It was raising my suspicion, at least. He was too nervous. Something was off…" Joint App'x at 54. As this and similar testimony demonstrates, in deciding to detain, question and search Santillan and Rivera-Vasquez, the officers relied principally on their perception that the men were "too nervous" and "off." Joint App'x at 50, 54, 59. Such subjective and slippery descriptions simply are not the type of "specific and articulable facts" we require to support reasonable suspicion. *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015). Beyond nervousness, the sole additional factor given for prolonging the stop was an unsatisfactory response from the men regarding their point of

1

origin. But nearly every stop will produce some answer that could be as vaguely unavailing in the mind of the officer as the answers given here. Accordingly, by condoning the officers' handling of this incident, I fear the majority may winnow the protections of the Fourth Amendment to a near nullity whenever an officer deems an individual simply "too nervous." Joint App'x at 54.

I.  No Reasonable Suspicion to Prolong Traffic Stop

In *Rodriguez*, the Supreme Court clarified that, when an officer conducts a traffic stop, "[a]uthority for the seizure … ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 135 S. Ct. at 1614; *see also United States v. Gomez*, 877 F.3d 76, 89-90 (2d Cir. 2017) (holding that *Rodriguez* abrogates prior Circuit rule regarding duration of traffic stops). As a result, "unrelated inquiries that prolong or add time to a traffic stop violate the Fourth Amendment absent reasonable suspicion of a separate crime." *Gomez*, 877 F.3d at 90.

Here, Officer Moreira testified that he had obtained all the information he needed to issue the traffic citation eight minutes into the stop. Thus, to comport with the Fourth Amendment, the prolongation of the stop after this point must be justified by reasonable suspicion of an independent crime.

As the majority explains, the basis for reasonable suspicion to extend the stop past the eight-minute mark effectively amounts to (i) nervousness, and (ii) an unsatisfactory description of the pair's point of origin. Op. at 15. With regard to nervousness, on direct, Office Moreira gave the following descriptions of Santillan and Rivera-Vasquez's behavior throughout the stop:

- "They appeared very nervous, were avoiding making eye contact. I noticed that their voice was kind of shaky and they were speaking in a low voice, and Mr. Vasquez's hands were shaking as he was handing me over the documents." Joint App'x at 50.

- *With regard to Rivera-Vasquez*: "I felt that his behavior was suspicious. It was raising my suspicion, at least. He was too nervous. Something was off…" Joint App'x at 54.

- *With regard to Santillan*: "[I noticed] his nervous behavior, the fact that he looked over the area. It was a totality of the situation. He looked over the area where he was sitting. His nervous behavior. … His vague answers, his hesitance to exit the vehicle, his shakiness in the voice, and his nervous behavior was just a little off." Joint App'x at 59.[1]

---

[1] I note that these last two answers were given in response to questions about why Officer Moreira felt he needed to frisk Santillan and Rivera-Vasquez. The frisks occurred after the eight-minute mark, and Officer Moreira cited nothing more as justification. I find this testimony pertinent to the analysis of whether reasonable suspicion existed prior to the eight-minute mark because it tracks the behavioral descriptions Officer Moreira gave about the pair both before and after the eight-minute mark: namely, that he found them to be too nervous. At no point did Officer Moreira testify that the men exhibited more extreme behavior. Further, on the separate question of whether the frisks were warranted, in my view, these answers are surely insufficient to establish that Officer Moreira reasonably believed that the pair were "armed and dangerous," *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 784 (2009), as needed to justify the frisks.

Officer Moreira also testified that the pair gave answers that he considered inordinately vague about their point of origin. Both Rivera-Vasquez and Santillan said they were coming from Santillan's aunt's house. Rivera-Vasquez did not identify a geographical location; Santillan said that the aunt's house was in New Jersey, and tried to further name "some type of city or town," which Officer Moreira did not understand. Joint App'x at 50-51.

In my view, looking to the totality of the circumstances, these grounds do not provide a basis for anything more than "an inchoate and unparticularized suspicion or hunch," and are insufficient to satisfy the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quotation marks omitted). Though we do not demand much to satisfy the reasonable suspicion standard, I disagree with my colleagues that this case falls just over the line into permissible territory.

First, there are myriad reasons to be wary when, as here, an officer appeals repeatedly to his assessment that "something was off." Joint App'x at 54; *see also* Joint App'x at 59. It is the very definition of an "inarticulate hunch[]." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). The protections of the Fourth Amendment depend on requiring something more than a faint statement of intuition. As the Supreme Court has routinely emphasized, "[i]f subjective good faith alone were the test,

4

the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." *Id.* (quotation marks omitted).

Beyond the assertions that "something was off," Officer Moreira testified that Santillan and Rivera-Vasquez were "very nervous," "too nervous," and exhibited "nervous behavior." Joint App'x at 50, 54, 59. A pronounced nervous reaction is, of course, a "pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Depending on the severity or character of the nervousness, and the combination of other factors present, it may well contribute to a finding of reasonable suspicion. Our inquiry is based on a "totality of the circumstances principle," *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015) (quotation marks omitted), and thus we must look to all pertinent indicia of legal wrongdoing—including, naturally, the individual's actions. *See, e.g., United States v. Arvizu*, 534 U.S. 266, 276-77 (2002). For example, flight from the police, viewed in conjunction with other factors, may provide sufficient grounds to investigate. *See Wardlow*, 528 U.S. at 124-25.

But reports of generalized nervousness, like Officer Moreira gave here, do not independently contribute much towards establishing a "particularized and

5

objective basis" for a stop. *Wardlow*, 528 U.S. at 128. Though less problematic than a statement that "something was off," an officer's report of nervousness is similarly subjective, indefinite, and too easily conflated with intuition. "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (Posner, *J.*). We must be particularly skeptical where, as here, the reported nervousness is not evidenced by some more extreme behavior—such as flight from the police—but only by more generalized observations.

Further, we should not blind ourselves to the reality that an individual's race and ethnicity often will affect assessments of that individual's behavior. *See United States v. Hussain*, 835 F.3d 307, 314–15 (2d Cir. 2016) ("Part of our trouble is that stops fitting the same fact pattern (but, say, different passengers of another race, gender, or ethnicity) would, we think, rarely if ever lead the police to suspect the passengers posed an immediate danger."). Murky descriptors like "nervous" may well implicate biases—which are often implicit and unknown to the officer—that code one individual's behavior as more suspicious only because

of the color of her skin. *See* Al Baker, *Confronting Implicit Bias in the New York Police Department*, N.Y.Times, July 15, 2018 (discussing NYPD's recent efforts to address implicit bias among officers). "[S]pecificity in articulating the basis for a stop is necessary in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and severely exacerbate police-community tensions." *Dancy*, 843 F.3d at 111 (quotation marks omitted). Relying on an officer's report of generalized nervousness is simply too imprecise to meet this goal.

To the degree that Officer Moreira testified to objective indicia of nervousness—shaky hands, and a "kind of shaky" voice, Joint App'x at 50—these reactions are quite mundane. Nearly everyone is nervous enough to exhibit some type of reaction when stopped by the police. Unlike a sudden flight from law enforcement, *Wardlow*, 528 U.S. at 124-25, these common indications of nervousness are a normal, routine response to being stopped. We have recognized that many individuals understandably find police contact "stressful and prefer to avoid interactions with law enforcement when possible." *United States v. Compton*, 830 F.3d 55, 62-63 (2d Cir. 2016) (Walker, *J.*). In the context of a traffic stop, the knowledge that an officer may soon issue a ticket, or may take

7

further action, is unnerving under the best of circumstances. Thus, using "commonsense judgments and inferences about human behavior," these common indications of nervousness are of comparatively little value in finding reasonable suspicion. *Wardlow*, 528 U.S. at 125.

Troublingly, in an effort to vindicate the actions of the officers, my colleagues come perilously close to claiming that only guilty people—or those with an open warrant for arrest—should experience nervousness when stopped by police. They write that Santillan and Rivera-Vasquez were "'very nervous' despite having no outstanding warrants that could have explained their nervousness." Op. at 16. This is shocking: an open warrant is hardly the only reason an individual might feel nervous. For most of us, the stop alone suffices to upend any feeling of calm.

Further, it is worth noting that a review of the dashboard footage, which was introduced at the suppression hearing, casts some doubt on the objective presence of visible nervousness. When both Rivera-Vasquez and Santillan were asked to step out of the vehicle (after the eight-minute mark), the ensuing interactions took place in full view of Officer Moreira's dashboard camera (though only very limited audio is captured). I would expect any nervousness to

be on full display at this point, after Officer Moreira escalated the situation by asking the men to step out of the vehicle. But the footage leaves the opposite impression. Officer Moreira testified that both Santillan and Rivera-Vasquez's nervousness resulted in the pair avoiding eye contact, speaking in a low voice, and, in Rivera-Vasquez's case, shaky hands. But on the video both Santillan and Rivera-Vasquez seem to be looking the officers in the face, speaking with reasonable animation, and, at one point, even perhaps joking with the officers. I will admit the two appear potentially to be cold. It was, after all, February in New York City, and snow lined the roadsides. But, based on my review of the pair's demeanor on camera, I simply do not share Officer Moriera's perception that they were visibly, highly nervous. Thus, while I would not argue that the district court clearly erred in accepting the officers' testimony to the effect that Santillan and Rivera-Vasquez were nervous, it is worth noting that this case provides a strong example of why nervousness often lies in the eye of the beholder.

Finally, in addition to nervousness, the sole other factor at the eight-minute mark was the unsatisfactory answer given by the pair regarding their point of origin. Rivera-Vasquez reported that they were traveling from

Santillan's aunt's house; Santillan said the aunt's house was in New Jersey, and tried to specify a town, but Officer Moreira was unable to understand him. These answers are hardly suspect.

Beginning at the outset of the traffic stop, when asked where they were coming from, Rivera-Vasquez, the driver, said Santillan's aunt's house. First, it is important to recall that officers routinely ask similar questions, but drivers are under no obligation to provide such information. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (during *Terry* stops, including traffic stops, "detainee is not obliged to respond" to officer's questions); *but see Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 187 (2004) (consistent with the Fourth Amendment, state law may require detainee to identify herself during *Terry* stop). Rivera-Vasquez nonetheless reported that he was coming from Santillan's aunt's house. Though perhaps it would have been preferable to give a geographic location, it is not particularly noteworthy that Rivera-Vasquez could not immediately do so. After all, it was Santillan's aunt's house, not Rivera-Vasquez's, where they reported beginning the trip. And both Rivera-Vasquez and Santillan produced identification showing that they were from out of state—Rivera-Vasquez from Massachusetts, and Santillan from New Hampshire. Thus

Rivera-Vasquez's reply might well have reflected only a lack of familiarity with the area. Further, in an era when many drivers are fully dependent on computer mapping programs to provide directions, it is unsurprising that the men—both from out of state—may have had a somewhat imprecise understanding of the location of the aunt's house. Many people today let their cell phone tell them exactly where to go, without troubling themselves as to the specifics.

Further, once Officer Moreira moved to the passenger side door, after spending approximately one minute at the driver side door, Santillan specified the state of origin as New Jersey. This would seem to be a sufficient answer to an officer's query of "where are you coming from" on a routine traffic stop in New York.

Finally, it is important to emphasize that it is unclear how much may have been lost in translation, since the conversation took place in both English and Spanish. The majority insists that there must not have been any miscommunication since Officer Moreira is a native Spanish speaker, and conversed with the men in both languages. Op. at 15. But Officer Moreira himself testified that he had difficulty understanding Santillan. *See* Joint App'x at 57 (Officer Moreira testimony that Santillan "had difficulty pronouncing the name

and I had difficulty understanding the name of where he was – the city or township where he was saying, but he did mention that it was in New Jersey"). Thus it is not at all clear that the pair actually failed to provide the more specific answers that Officer Moreira was pressing for; rather, from Officer Moreira's own recollection, it is clear that at least Santillan attempted to provide further information, but Officer Moreira had difficulty understanding him.

Accordingly, in my view, the answers given by the men do not suffice to push this stop across the line and establish reasonable suspicion. The men specified that they were coming from Santillan's aunt's house in New Jersey, and there was some difficulty speaking across two different languages, which prevented them from communicating the more specific answer Officer Moreira sought. Many drivers, already nervous, will provide answers that the officer might find just as vaguely wanting as these.

Accordingly, in my view, there was not reasonable suspicion to prolong the stop past the eight-minute mark, when Officer Moreira should have completed the traffic citation. Though Officer Moreira felt their answers were unsatisfactory and their behavior "too nervous," such perceptions could only provide a basis for a hunch (which, of course, was later proven to be correct). But

they do not provide articulable grounds to believe the pair were engaged in "legal wrongdoing." *Singletary*, 798 F.3d at 59. Indeed, I fear that because nervousness is a near-universal response to being pulled over by a police officer—regardless of whether the person has anything to hide—and because an officer may easily find one answer or another vague and unsatisfactory during the typical traffic stop, the majority's analysis could be used to justify all manner of investigatory stops that have no basis other than the officer's indistinct suspicion.

II.     Events Following the Eight Minute Mark

Because I would not find reasonable suspicion to prolong the stop, I do not address the events following the eight-minute mark in great detail. But I offer a few observations, as Officer Moreira's actions following the eight-minute mark provide further indication that he was following up on a hunch, in disregard of the strictures of the Fourth Amendment.

After the eight-minute mark, Officer Moreira returned from his patrol car and asked Rivera-Vasquez to exit the vehicle. He then frisked Rivera-Vasquez, pulled out his wallet, examined its contents, and asked Rivera-Vasquez to sit in the back of his patrol car, thus locking him in the backseat (after reassuring him

13

that he "wasn't in any trouble," Joint App'x at 55). Officer Moreira then repeated this process with Santillan, removing the contents of his pockets and asking him to sit in the back of another police car.

First, it is plain that these actions violated the Fourth Amendment. Even the majority concludes that the search of Santillan's pockets was impermissible, since there was no basis to believe that what turned out to be cash was either a weapon or contraband, as required to remove an item for inspection during a safety frisk. Op at 21-22. Of course, removing the contents of the pair's pockets did serve one clear purpose: allowing Officer Moreira to continue his investigation by riffling through the men's belongings in hopes of turning up evidence.

Second, Officer Moreira's testimony following the eight-minute mark shows that his suspicions were elevated by a number of utterly commonplace items. For example, Officer Moreira testified to becoming increasingly suspicious after observing energy drinks, one extra cellphone, and cell phone chargers. I imagine many college students might be surprised to hear that energy drinks figured prominently into the calculus. Similarly, anyone who has been required

14

to carry a separate cell phone specifically for work might find the officers' suspicions based on one extra phone rather strained. I certainly do.

*     *     *

Accordingly, I cannot agree that the officers had reasonable suspicion to prolong the stop any longer than necessary to issue the ticket. Generalized nervousness combined with an imprecise response about the point of origin is simply not enough to satisfy the Fourth Amendment.

In my view, finding reasonable suspicion based largely on ineffable perceptions that an individual was "too nervous" runs roughshod over the requirement that an officer provide a "particularized and objective basis" for a stop. *Wardlow*, 528 U.S. at 128. Further, finding reasonable suspicion here risks granting officers unfettered discretion to detain anyone they wish based on a passing hunch. Many—if not most—traffic stops will yield nervous drivers and one or another answer that the officer could find unsatisfactory in some regard. Though reasonable suspicion is not a demanding standard, if it is to retain any meaning, it must require more that the impressionistic suspicions that Officer Moreira supplied here.

For these reasons, I respectfully dissent.